## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

_____                )

**GINA RUSSO,**                )          **CIVIL CASE NO.: 1:21-cv-00703-SM-TSM**

         Plaintiff,                )

v.                )

**NEW HAMPSHIRE NEUROSPINE**                )
**INSTITUTE, P.A. and**                )
**URI M. AHN**                )

         Defendants.                )
_____                )

## PLAINTIFF GINA RUSSO'S MEMORANDUM OF LAW
## IN SUPPORT OF HER OBJECTION TO DEFENDANT NHNSI'S
## MOTION FOR SUMMARY JUDGMENT

      Plaintiff Gina Russo submits this Memorandum of Law in support of her objection to the

Motion for Summary Judgment filed by New Hampshire Neurospine Institute, P.A. ("NHNSI"

or the "Practice"). In support of her Objection, Plaintiff states as follows:

### I.      INTRODUCTION

      NHNSI's Motion for Summary Judgment inappropriately relies on mischaracterizations

of the Court's November 22, 2024 Memorandum Order, Dkt. # 64 ("Order") granting summary

judgment to defendant Uri M. Ahn ("Ahn") on claims against him in his individual capacity.[1]

Plaintiff Gina Russo  opposes this motion because summary judgment is not an appropriate

remedy because there are material facts in dispute and there is sufficient evidence to permit a

reasonable fact-finder to rule in her favor.

_____

[1] Plaintiff has moved for reconsideration of the Court's decision. Dkt. #78. Her Motion remains pending before the Court.

## II.    OPPOSITION TO NHNSI'S FACTUAL BACKGROUND

| Fact | Response | Citation |
|------|----------|----------|
| 1 | **Disputed**. The statement is unsupported by record citations, and the Court did not make the determination asserted by NHNSI. | |
| 2 | **Disputed**. The statement is unsupported by record citation because the Court did not find that Plaintiff's tone was "rude, hostile, and unprofessional" or, if it did, then it exceeded its authority by acting as fact finder. Further answering, Plaintiff was not rude, hostile, or unprofessional. She responded to Ahn prioritizing the most emergent patient who was coding, and when Ahn conveyed displeasure with her response, she sought confirmation from Jenkins and Wang that she was managing the situation appropriately. After Jenkins and Wang confirmed that Russo should stay with the coding patient, Russo called Ahn back and relayed this information to him and that she did not know how long it would be before she was free. Russo's testimony is that when she suggested that Ahn might be able to get to the urgent patient at St. Joseph Hospital first, he became angry with her. | Order, p.5.<br><br><br>*Ex. 1,* Deposition of Gina Russo ("Russo Tr.") 62:12-69:12; *Ex. 22; Ex. 15* at ¶14. |
| 3 | **Disputed**. The statement is unsupported by the record citations. The Court found Plaintiff discussed the possibility of alternative procedures in response to a patient inquiry, and then inquired with Dr. Luther when she could not find Dr. Ahn.<br>Further answering, Plaintiff disputes that she "suggested" an alternative procedure. Plaintiff responded to the patient's questions which included a question about altering the procedure he would have, following the consent script provided to her by NHNSI, and seeking guidance from another supervising surgeon when she could not find Ahn. | Order, p.6.<br><br><br>*Ex. 15* at ¶27, *Ex. 1,* Russo Tr. 124:16-129:16; |
| 4. | Partially **disputed**. Ahn assumed that when Russo said "do you want me to go home and do this, or do you want me to walk you through it so you can do it yourself", Russo was giving him a "poor choice" in a "passive aggressive attempt to get out of doing the task". | *Ex. 24*[2]. |
| 5. | Partially **disputed**. The partners voted on which person would leave the practice – Ahn or Russo – after Ahn demanded that they choose who would leave and who would stay. The Partners voted to retain their Partner, Ahn. | *Pl. Ex. 5,* Deposition of N. Ross Jenkins ("Jenkins Tr.") 47:4-49:20; 80:12-81:21. |

---

[2] Unless otherwise noted, all Exhibits are attached to the Declaration of Kamee Verdrager, Esq.

| 6. | **Disputed**. NHNSI cites only the Order, demonstrating that the Court engaged in impermissible fact-finding.[3] | |
| 7. | **Disputed**. NHNSI cites only the Order, demonstrating that the Court engaged in impermissible fact-finding. | |
| 8. | **Disputed**. Plaintiff alleges that NHNSI excluded all female PA-Cs from the scheduling responsibility. Par. 8 is further **disputed** because male PA-Cs were not required to be present in the office every day in order to hold the scheduling position. | Complaint ¶42; *Ex. 2,* Deposition of Anne Talbott-Kleeman ("Talbott-Kleeman Tr." 102:18-103:2. |
| 9. | **Disputed**. The statement is a conclusion of law unsupported by record citations. The cited testimony refers to a time before the merger, whereas Plaintiff's allegations relate to the PA Organizer role created after the merger. | *Compare Ex. 1,* Russo Tr. 113:17-114:20 *and* Complaint ¶42; *Pl. Ex.* 19. |
| 10. | **Disputed**. The statement is a conclusion of law unsupported by record citations.<br>Further answering, because Ahn, a NHNSI Partner, is an agent of NHNSI, who acted as a both a decision-maker and someone who influenced the employment decisions at issue employment, all allegations regarding Ahn are, as a matter of law, also allegations concerning the Practice. | *See, e.g.,* Complaint ¶36-44; 48-51; 56; 58-63; 69-79; 91-99.<br>*See* 42 USC §§ 2000e(b); N.H. RSA 354-A:2. |
| 11. | **Disputed**. The statement is unsupported by record citations. | *See, e.g.,* Complaint ¶ 30, 45-51, 59, 62; *Ex. 2,* Talbot-Kleeman Tr. 165:6-166:2, 166:14-167:9,154:17-158:14; *Ex. 36* |
| 12. | **Disputed**. NHNSI cites only the Order, demonstrating that the Court engaged in impermissible fact-finding. | |
| 13. | **Disputed**. NHNSI cites only the Order, demonstrating that the Court engaged in impermissible fact-finding. | |
| 14. | **Disputed**. NHNSI cites only the Order, demonstrating that the Court engaged in impermissible fact-finding. | |
| 15. | **Disputed**. NHNSI cites to the Order, demonstrating that the Court engaged in impermissible fact-finding. Further answering, this allegation is **disputed** because the patient consented to the procedure proposed by Ahn after Russo addressed all of his questions. | *Ex. 1,* Russo Tr. 129:9-16. |
| 16. | **Disputed** to the extent this fact relies on the Court's impermissible fact-finding. Further **disputed** because Ahn's claim that his patient "lack[ed] [] confidence in [Ahn's] proposed surgical plan" is directly contradicted by the patient's consent to that surgery. | *Ex. 1,* Russo Tr. 129:9-16. |
| 17. | **Disputed**. NHNSI cites only the Order, demonstrating | *Ex. 1,* Russo Tr. 131:12- |

---

[3] See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (The credibility of the witnesses, weighing of the parties' evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.).

| | that the Court engaged in impermissible fact-finding. | 132:5; 133:7-134:14. |
|---|---|---|
| 18. | **Disputed**. Ahn screamed at and threatened Russo, and tried to intimidate her to act unethically by only discussing bleeding and infections with patients. | *Ex.* 1, Russo Tr. 133:7-134:14; *Ex. 3*, Deposition of Uri Ahn ("Ahn Tr.") 86:6-87:7; Complaint ¶48. |
| 19. | **Disputed**. Russo followed NHNSI's script when consenting the patient and when she spoke with both Dr. Luther and Dr. Jenkins, neither advised her that she acted improperly. | *Ex. 1, Russo Tr.* 124:16-126:4; 141:14-144:3. |
| 20. | The first sentence is undisputed. The second sentence is **disputed** as it is unsupported by the record citation. | |
| 21. | **Disputed.** Jenkins testified that the Partners voted to keep Ahn, <u>not</u> to terminate Russo. | *Ex. 5*, Jenkins Tr. 47:4-49:20; 80:12-81:21. |
| 22. | **Disputed.** The record citation does not support the facts asserted, and further, the "Note to file" of Ms. Talbot-Kleeman, upon which this assertion relies, was disputed by Russo's testimony. | *Ex.* 1, Russo Tr. 190:10-198:11. |
| 23. | **Disputed.** The statement is unsupported by the record citations. | |
| 24. | Undisputed. Russo reported her concerns regarding gender discrimination and Talbot-Kleeman ignored her concerns. | *Ex. 2,* Talbott-Kleeman Tr. 186:4-187:13. |
| 25. | Undisputed. | |
| 26. | **Partially disputed.** Further answering, the Practice ignored Russo's report of discrimination and engaged in self-serving negotiations with Plaintiff in an attempt to extract a release from her of all claims she had against the Practice. | *Id.* |
| 27. | Undisputed. | |
| 28. | Partially **disputed**. Plaintiff wanted to continue her employment at NHNSI, working only for Dr. Batlivala; at HCNH (Hillsborough County Nursing Home). | *Ex. 45 at #9; Ex. 52; Def. Ex.* 7. |
| 29. | The first and second sentences of Par. 29 are undisputed, subject to the clarification in Par. 28, *supra*. The last sentence of Par. 29 is not supported by any record citation and is **disputed**. | *Sec. II, ¶28.* |
| 30. | Undisputed that the April 11, 2019 Confidential Separation & General Release Letter reduced the severance offered by NHNSI from $15,000 to $2,500. | |
| 31. | Undisputed. | |
| 32. | **Disputed.** The statements are unsupported by the record citations. Further answering, Talbot-Kleeman emailed members of the Practice on April 25, 2019 notifying them that Russo would be working the following week. | *Ex. 92* , NHNI_001542. |
| 33. | **Disputed**. The record citation does not support the assertion that there was no response from Plaintiff prior to April 29, 2019. | *Id.* |

| 34. | **Disputed**, as written. Plaintiff does not dispute that she did not agree to accept the terms of the April 11, 2019 separation agreement, but as her attorney's April 29, 2019 letter plainly states, "she wishes to remain employed by the Institute[;][s]he did not seek out this termination and she does not welcome it", but now that "Ms. Russo specifically raised gender bias at the Institute in a conversation with you…yet…the Institute has not bothered to investigate this issue", "it is absurd that the Institute now seeks to penalize Ms. Russo for not wanting to continue working in this hostile and discriminatory environment, for three additional months…" | *Ex.* 54 |
|---|---|---|
| 35. | **Disputed** that the reference to the prior offer was "strange" considering that the Institute was both claiming that Russo needed to be terminated but also willing to pay her more money to continue working for two additional months. | *Id.;* |
| 36. | **Disputed.** Talbot-Kleeman disclosed that the Institute was only willing to pay the severance if Russo would continue to work through June 2019 because an earlier departure would cost the Institute money. | *Id.* |
| 37. | Undisputed that the Employee Handbook is quoted correctly. **Disputed** that "[s]urgeons are considered employees of the Practice and not authorized to provide references…without authorization…" as this statement is unsupported by the record citation and Talbot-Kleeman testified she and the physicians on the Board or Directors are "owners" of the Practice. *Pl. Ex. 2,* Talbott-Kleeman Tr. 11:1-17. Further answering, multiple NHNSI Partners testified that Russo was the only employee they were ever directed not to provide a reference for and Talbot-Kleeman wrote that "her threat of legal action" was the reason for the departure. | *Ex. 33, §203; Ex. 4,* Deposition of Paul Wang ("Wang Tr.") 15:3-16:8 (partners of the practice purchase an equal ownership share); *Ex. 5,* Jenkins Tr. 89:21-90:3 (Russo is the only employee he has ever been directed not to provide a reference for); *Ex. 6,* Deposition of Zubin Batlivala ("Batlivala Tr.") 49:22-50:7 (same); *Ex.* 45 at #36. |
| 38. | **Disputed**. As stated above, Talbot-Kleeman departed from standard policy due to Russo's "threat of legal action" and never permitted the Partners to provide any reference for Russo. | *Id.; Ex. 5,* Jenkins Tr. 69:4-70:19. |
| 39. | **Disputed**. The record evidence shows that this is not what Talbot-Kleeman told the Partners and there is no evidence or mention of any "protocol". | *See #37-38, supra.* |
| 40. | Undisputed that Dr. Batlivala gave Russo a written reference letter; **disputed,** because he was prevented from responding to an inquiry from a hospital looking to hire Russo more than one month after she was terminated. Undisputed that Plaintiff found new | *Ex.* 45 at #36; *Ex. 60 and 61.* |

| | employment. | |
|---|---|---|
| 41. | Undisputed. | |
| 42. | Undisputed. | |
| 43. | **Disputed**. The statement that Attorney Bailey did not find "any evidence of gender discrimination" is not supported by the record citation. Further answering, Attorney Bailey's determination was based on a scale of 51% to 49% "more probable than not". | *Pl. Ex. 9*, Deposition of Elizabeth Bailey ("Bailey Tr.") 24:22-25:13. |
| 44. | The first sentence is undisputed. The second sentence is **Disputed**. NHNSI cites only the Order, demonstrating that the Court engaged in impermissible fact-finding and witness credibility evaluations. | |
| 45. | **Disputed**. NHNSI cites only the Order, demonstrating that the Court engaged in impermissible fact-finding. | |
| 46. | **Disputed**. NHNSI cites only the Order, demonstrating that the Court engaged in impermissible fact-finding. | |
| 47. | **Disputed**. The statement is unsupported by the record citation to only 1 paragraph in a 124 paragraph Complaint and the Order (once again demonstrating that the Court has exceeded its authority at summary judgment). | *See #10, supra.* |
| 48. | **Disputed.** This statement is an argument, not a statement of fact. | *See #9 and #10, supra.* |

## III. PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS

1.     NHNSI has doctors that hold ownership interests and therefore voting rights ("Partners"), as well as non-voting doctors who are employees of the Practice. *Ex. 4*, Wang Tr. 15:3-16:8.

2.     The Practice is in an "extraordinarily" male dominated field. *Ex. 11,* Gamble Tr. 38:15-17.

3.     Ahn is a Partner in the Practice, with an ownership interest and voting rights. *Ex. 3,* Ahn Tr. 13:12-14:11; *Ex. 6,* Batlivala Tr. 21:22-22:4 (only physician shareholders of the practice have voting rights).

4.     Executive Director, Anne Talbot-Kleeman ("Talbot-Kleeman") oversaw the functioning of NHNSI. *Ex. 2,* Deposition of Anne Talbot-Kleeman (Talbot-Kleeman Tr.") 10:8-11:17. Talbot-Kleeman manages employee discipline for NHNSI. *Ex. 3,* Ahn Tr. 77:10-15.

6

5.    NHNSI did not have a human resources department or specialist during Russo's employment. *Ex. 2,* Talbot-Kleeman Tr. 18:19-19:10; *Ex. 4,* Wang Tr. 127:8-19.

6.    Talbot-Kleeman also held an ownership interest in the Practice and is married to Dr. Thomas Kleeman, another Partner of the Practice. *Ex. 2,* Talbot-Kleeman Tr. 11:2-5, 16:11-13; *Ex. 4,* Wang Tr. 15:3-16:4.

7.    Russo was hired by NHNSI as a PA-C in 2008. *Ex. 1,* Russo Tr. 20:23-21:4. Prior to joining NHNSI, Russo had been a PA-C for nine years, and had extensive experience as a surgical PA-C, having spent her entire career in positions with a surgical component (a breast surgery specialist, a subset of general surgery at the Brigham, and for a plastic surgeon). *Id.* 18:14-23:8.

8.    Russo was 1 of only 2 female PA-Cs employed by NHNSI when she was terminated. *Complaint* ¶12-13; *Ex. 13* at Int. No. 5; *Ex. 15* at ¶10.

9.    NHNSI has never hired a female surgeon or a female physician. *Ex. 3*, Ahn Tr. 15:10-20; *Ex. 4*, Wang Tr. 41:22-42:1. *See also Ex. 2*, Talbot-Kleeman Tr. 96:14 -97:11.

**Gina Russo Was a Well-Regarded and High Performing
Long-term Employee with No History of Discipline**

10.    In August 2016, Russo received an overall performance evaluation noting that she "is flexible and willing to make schedule changes to accommodate the needs of the office[,] often works extra hours or switches days when asked [and] is able to work effectively with others and gets along well with everyone." *Ex.* 16. Russo received a raise and her mid-year bonus awarded in August 2016 was $7000.00 *Ex. 94.* Dr. Jenkins also evaluated Russo, noting her flexibility and willingness to help out, and that there were "No" concerns with Russo's work. *Ex. 93.*

11.    On December 23, 2016, Russo was awarded a year-end bonus of $4000. *Ex. 95.*

12.    In February – March 2017, NHNSI sought to have Russo increase the amount of days per week that she was regularly scheduled to work. *Ex. 17* at NHNI_001462; *Ex. 18.*

13.    Ahn evaluated Russo with the highest possible rating in every category in 2017, immediately following his request to stop operating with her. *Ex. 39* (June 22, 2017, St. Joseph Hospital)*; Ex. 40* (August 8, 2017, Southern New Hampshire Medical Center); *Ex. 15* at ¶20. Ahn knew that he did not need to rate Russo this high for her to obtain credentials. *Ex. 3*, Ahn Tr. 133:11-14.

14.    On August 15, 2017, Russo was awarded a $6500.00 mid-year bonus in appreciation for her "ongoing hard work and dedication to the practice." *Ex. 96*.

15.    On December 22, 2017, Russo received bonus compensation of $3000 cash, and $2666.68 in the form of a retirement account contribution. *Ex. 97*.

16.    NHNSI evaluated Russo as "Excellent" in every category except three, where she was rated as "Satisfactory" between 2016 and February 2018. *Ex. 17* at NHNI_001463.

17.    On September 4, 2018, Russo was awarded a $4000 mid-year bonus. *Ex. 98*.

18.    On December 21, 2018, Russo was awarded a bonus of $5400 in appreciation for "all you have done." *Ex. 99*.  In addition, Talbot-Kleeman wanted to sit down with Russo the following month to discuss any needs and suggestions Russo had. *Id*.

19.    Russo was an experienced surgical PA with strong technical abilities. *Ex. 11,* Gamble Tr. 28:1-29:1.

20.    The ortho and neuro practices require overlapping surgical skills from the PA-Cs with the exception of intracranial/brain related procedures on the neurosurgery side of the practice. *Ex. 4,* Wang Tr. 83:23-84:17; *Ex. 5*, Jenkins Tr. 15:22-16:11 (overlapping skills on spine surgery, but not on brain surgery, which is only performed by the neurosurgeons in the practice); *Ex. 3*, Ahn Tr. 20:12-23 (noting that "there's not much difference" between a neurosurgeon doing spine surgery and an orthopedic spine surgery).

21.    Dr. Gamble performs the most complex, cutting-edge procedures in the Practice.

*Ex. 4,* Wang Tr. at 86:4-87:8.

22.    The NHNSI Employee Handbook includes Employee Conduct and Work Rules, the

failure to comply with, may result in disciplinary action. *Ex. 33,* §701. Included among the

infractions of rules of conduct that may result in disciplinary action are:

> ➢Unsatisfactory performance or conduct
> ➢Insubordination or other disrespectful conduct *Id.*

23.    NHNSI alleges that Russo had three incidents of insubordinate, inappropriate or

unprofessional behavior, with respect to Ahn:

(i.)   October 2016 – when Ahn wanted Russo to see a patient in the ER at St. Joseph Hospital for him (he was the surgeon on call) (hereinafter the "SJH Interaction" *Ex. 27, p.3-7, Ex. 15, ¶12-18;*

(ii.)  Spring/Summer 2017 – when Russo addressed a patient's questions while obtaining his pre-operative informed consent (hereinafter the "Consent Interaction") *Ex. 27, p. 7-9; Ex. 15, ¶27-29.*

(iii.) March 9, 2019 – when Ahn at Elliot Hospital asked Russo at CMC to help him discharge a patient *Ex. 27, p.10-16; Ex. 15, ¶32-38.*

24.    Russo was never warned or disciplined, and instead, she received positive

evaluations, assurances that she had acted correctly, bonuses and profit sharing retirement

contributions. *See Par. 13-21, supra*; Ex. 100, Affidavit of Gina Russo ("Russo Aff.") ¶ 4-6; *Ex. 4,*

Wang Tr. 64:18-23, 74:4-75:6, 76:12-21 (reassuring Russo that Ahn was only upset about the

SJH Interaction because she had unknowingly "caught him with his pants down")

25.    After the Partners voted to retain Ahn and let Russo go, multiple doctors in the

Practice, including Partners and surgeons, reached out to Russo to express their disagreement

with the decision, apologize for NHNSI's treatment of Russo, and even to declare it "TOTAL

BS". *Ex.* 47; *Ex.* 51.

26.    Talbot-Kleeman admitted that Russo was chosen to leave the Practice because "it

was a he said/she said situation, and he [Dr. Ahn] has the power." Ex. 27 at SPBG_00143.

**The Purported Reasons for Russo's Termination and the Retaliation**

### A. The SJH Incident

27.    Orthopedic surgeons are in a separate on-call group and are expected to cover their own patients. Per NHNSI policy, it is outside of a PA-C's on-call responsibilities to cover orthopedic patients and the hospitals where there are no neurosurgery patients. *Ex. 11,* Gamble Tr. 12:15-14:2, 33:13-34:6, 41:23-43:1; *Ex. 4*, Wang Tr. 34:16-36:23, 39:1-15.

28.    NHNSI policy imposes a "duty" upon surgeons disagreeing about the priority of a PA-C's on-call work to coordinate with each other to resolve the conflict. *Ex. 25.*

29.    While Russo was on-call at the Elliot, Ahn contacted her about a patient who presented at SJH with an epidural abscess, a very urgent condition caused by infection that can lead to paralysis. *Ex. 1*, Russo Tr. 63:6-64:1; *Ex. 22, Ex. 15* at ¶12.

30.    Russo told Ahn that she was dealing with a coding patient for Wang and he could likely get to the urgent patient at SJH sooner. *Complaint* ¶26-27; *Ex. 15* at ¶13.

31.    Ahn thought Russo was lying to avoid work and called Wang to verify. *Ex. 4*, Wang Tr. 55:20 -58:5.

32.    In July 2019, Ahn characterized Russo as "unhelpful, disrespectful, offered no help" for the SJH patient; he did not report that Russo was insubordinate. *Ex. 29.* at SPBG 00224 – SPBG 00225.

33.    Russo "followed [Wang's] directions to a T". *Ex. 4*, Wang Tr. at 55:20-57:16; 64:18-23. Jenkins, who was the on-call surgeon supervising Russo that weekend, agreed that Russo had prioritized things correctly. *Ex. 5*, Jenkins Tr. at 35:12-36:15.

34.    When Russo finished with the coding patient at the Elliot, she went to SJH and saw the patient, updated both Drs. Thomas and Ahn, and scheduled the patient for surgery. *Ex. 22; Ex. 1*, Russo Tr. 68:4-71:5.

35.    Russo tried to discuss with Wang her upset at Ahn's anger with her, his accusation that she was lying, and her feeling that if she had been one of the male PAs he would have said "Dude, I'm out of town, can you, you know, get there as soon as you can?" and the situation would have been resolved, Wang laughed off her concerns and told Russo not to worry about it. *Ex. 1*, Russo Tr. 74:4-75:6. Per Wang, Russo had done nothing wrong – Ahn was just angry because Russo had caught him with his pants down and made him look bad. *Id.*

36.    On May 6, 2017, a Saturday, Ahn was on-call and failed to be available for numerous calls to his cell and home phones, texts, and emails from Georgia Plamondon ("Plamondon"), Talbot-Kleeman, and the Practice answering service. *Ex. 82.*

**B.    The Consent Incident**

37.    Russo followed the NHNSI-provided script when obtaining the patient's consent, and Dr. Jenkins, Dr. Luther, and PA-C Plamondon have all confirmed that Russo handled the issue correctly. *See Plaintiff's Response to NHNSI's Factual Background* at ¶3, 15-19; *Ex. 7,* Plamondon I Tr. 61:14-63:12, 67:7-68:19.

38.    After responding to the patient's questions, the patient consented to the procedure that Ahn recommended and planned for. *Ex. 1*, Russo Tr. 129:9-21.

39.    Ahn confronted Russo about how she handled the consent and told her it was not her job to discuss anything except bleeding and infection. *Id.* at 131:12-132:5. Russo took out the scripts provided by NHNSI and attempted to show Ahn what was required for her to obtain legally valid consent (discussing all risks and benefits), and he reiterated his demand that she only discuss bleeding and infection with his patients. *Id.*

40.    Concerned that Ahn was trying to force her to behave unethically, Russo reported the discussion with Ahn to Luther and Jenkins. *Id.* at 141:14-144:3. Luther and Jenkins both told Russo that she had acted correctly, but neither Partner intervened to protect Russo from

Ahn or to correct his directive. *Ex. 100*, Affidavit of Gina Russo at ¶ 9.

### C.    The March 9, 2019 Incident

41.    Eric Plumley, an Elliot Hospital PA, heard Ahn speaking to Russo and reported his tone as a "little unsettling". *Ex. 27* at NHNI_000371-NHNI_000372.

42.    Per Ahn, Russo "stated" "I'm at CMC, so do you want me to go home and do this, or do you want me to walk you through it so you can do it yourself." *Ex. 24.*

43.    Ahn claimed it was clear that Russo was "framing a choice" for him to make so that she could get out of doing the task. *Id.*

44.    Ahn said it was "obvious" what he would and would not want, and her "poor choices" were a "passive aggressive attempt to get out of doing a task." *Id.*

45.    Ahn said Russo had "crossed a line of respect to an employer that [he felt] was beyond inappropriate." *Id.*

46.    Ahn reported to Wang that **he** had "blown up" at Russo. *Ex. 31* at SPBG 00388.

47.    Wang believed Ahn would calm down and told him he did not 100% support terminating Russo. *Ex. 31* at SPBG 00389.

### D.    The Partner's Meeting

48.    Ahn contacted all of his Partners to solicit their support to terminate Russo's employment. *Ex. 3,* Ahn Tr. at 156:1-6; 158:22-159:7, *Ex. 31* at SPBG 00389.

49.    Ahn "probably" told them Russo had "tried to get out of doing the job and then she yelled at [him]." *Ex. 3,* Ahn Tr. at 156:1-6.

50.    Prior to and at the Partner's meeting, Ahn described the SJH incident but failed to disclose that he had confirmed Russo was following the directives of Jenkins and Wang by attending to a patient in acute distress. *Ex. 30* at SPBG 00244; *Ex. 3*, Ahn Tr. 156:1-18; *Ex. 5*, Jenkins Tr. 38:4-15.

51.   Jenkins tried to correct the lie about Russo by telling the Partners Russo "appeared to have done what she should have done", but Ahn cut him off and instructed Jenkins not to interrupt him, preventing disclosure. *Ex. 5*, Jenkins Tr. 38:4-15.

52.   The Partners were asked to vote on which person would stay in the Practice: Ahn or Russo and they voted to transition Russo out of the practice. *Ex. 27* at NHNI_000379 – NHNI_000383; *Ex. 5*, Jenkins Tr. 47:4-49:20.

53.   NHNSI decided that there was no way to pull Russo completely away from Ahn or his patients, and Russo's expressed feelings that Ahn is "lazy, cut corners, spent five minutes with patients" and things along those lines meant that Russo and Ahn could not work in the same environment regardless of whether she was seeing his patients directly or not. *Ex. 2,* Talbot-Kleeman Tr. 165:6-166:2, 166:14-167:9,154:17-158:14; *Ex. 36* (Ahn's treatment of patients and 2-minute rounds are not appropriate). Russo had also reported her concerns to Wang that Ahn was lazy and cut corners with patient care. *Ex. 4,* Wang Tr. 70:22-71:9.

54.   The Partners did not vote to find Russo insubordinate or unprofessional. *Id.* at NHNI_000384 ("The consensus was that NHNSI wanted to work out a smooth transition..")

55.   Dr. Jenkins would have voted "No" if he had been asked to vote to find Russo insubordinate or unprofessional. *Ex. 5*, Jenkins Tr. 49:21-50:20.

**E.   Defendants' Shifting Reasons and Retaliation Against Russo**

56.   Talbot-Kleeman met with Russo the day after the Partner's Meeting to inform her that Ahn had "asked for her termination and they couldn't get him to agree on anything else" so Russo would need to leave the Practice.  Talbot-Kleeman and Russo discussed possibilities for a transition plan where her employment would be terminated at some (not yet identified) future date. *Ex. 27* at SPBG_00143; *Ex. 15* at ¶41; *Ex. 50*; *Ex. 66* at AHN_000017.

57.   Initially, Defendants wanted Russo to continue working at NHNSI for three (3)

13

additional months, and they were willing to pay her severance of $15,000 if she agreed to do so. *Ex. 15* at ¶44. NHNSI called the $15,000 a "bonus" to Russo for continuing her employment through the end of June 2019. *Id.*

58.     Defendants planned to categorize Russo's departure as due to "irreconcilable differences" – and **not** a termination due to Russo's misconduct - so she could collect unemployment benefits. *Ex. 49. See also Ex. 27* at NHNI_000384 (employment "could not continue").

59.     Dr. Batlivala was not happy with Russo's termination and apologized for the Partner's decision the day after the Partner's Meeting. *Ex. 47.* Batlivala told Russo to "stay strong" and promised "we will try to figure this out". *Id.*  Batlivala wanted Russo to continue working for him at the Hillsborough County Nursing Home (HCNH). *Ex. 52; .* as an independent contractor. *Ex. 53; Ex. 45* at #19.

60.     On March 29, 2024,  Russo discussed with Talbott-Kleeman her concern that the decision to terminate her employment was the result of a pattern of bias against women at NHNSI. *Ex. 15, ¶42.*

61.     Defendants initially left Russo's termination date to her discretion, if she did not want to remain employed by them through June 30, 2019, she could select an earlier date. *Ex. 45* at #16; *Ex. 89.*

62.     When Russo expressed her reluctance to working three months pending her final termination, Defendants' revised the Separation Agreement to reflect an earlier end to her employment, but also reduced the severance pay they were offering her. Talbot-Kleeman claimed this was done because by leaving sooner, Russo was costing the Practice money. *Ex. 89, Ex. 54.*

63.     By April 17, 2019, NHNSI learned that Russo had engaged counsel and her

attorney spoke with Talbot-Kleeman. *Ex. 54.*

64.    Russo sent a demand letter to NHNSI on April 29, 2019, discussing her claims of gender bias (hereinafter the "Demand Letter"). *Ex. 54.* The following day, April 30, 2019, Talbot-Kleeman told her sister, another NHNSI employee, that she would be firing Russo that week. *Ex. 74.*

65.    On May 2, 2019, while she was still at work, notice was sent through counsel that Russo's employment was terminated. *Complaint* ¶ 82, Dkt.#1; *Ex. 56.*

66.    Defendants terminated Russo's employment on May 2, 2019 because she was "making allegations that are unacceptable and demanding a large sum of money." *Ex. 45* at #29.

67.    On May 3, 2019, Talbot-Kleeman wrote to the NHNSI partners "As you know, I have been attempting to work with Gina towards a transition plan that was mutually agreeable. …Her proposal is unacceptable to NHNSI and as such her employment has been terminated as of EOB 5.2.2019." *Ex. 57.*

68.    Defendants instructed NHNSI doctors to <u>not</u> to provide employment references for Russo "due to these threats". *Ex. 45* at #35; *Ex. 58-61*

69.    This was not standard NHNSI procedure; Russo's employment references were blocked solely because of "her threat of legal action." *Ex. 45* at #36 ("As you all know Gina has made threats of wrongful firing…Given the situation I am advising her and her attorney that those requests must go through our legal counsel.". Talbot-Kleeman advised Drs. Jenkins and Luther that until Russo's counsel acknowledged that Russo would enter into a resolution with NHNSI, "I don't think we can send anything. It would not be an issue had there not been threats made." *Ex. 59*

70.    Defendants knew it would be damaging to Russo to not have a reference from NHNSI. *Ex. 60-61*; *Ex. 5,* Jenkins Tr. 84:12-23.

71.    Other than Russo, Defendants have never directed doctors to <u>not</u> write references for a Practice employee. *Ex. 5,* Jenkins Tr. 89:21-90:3.

72.    NHNSI continued to interfere with Russo's references in June 2019, and her need to obtain confirmation of insurance coverage in August 2019. *Ex. 60; Ex. 63*

73.    Russo could have continued working at HCNH after her termination from NHNSI without having to be directly involved with Ahn. *Ex. 2,* Talbot-Kleeman Tr. 192:20-194:3. Batlivala only had concerns about Russo continue to work for HCNH "once she made the claims of feeling she was being unfavorably treated". *Id.* at 189:6-19019; *Ex. 45* at #30 (Batlivala explaining that Gina's "unacceptable allegations" are why he has stayed away from calling or texting her)

74.    Russo's position was quickly filled by a male PA-C, Eric Valasquez. *Ex. 90.*

**There is Abundant Evidence that the Female PA-Cs at NHNSI Were Treated Less Favorably Than the Male PA-Cs and The Practice Consistently Ignored Concerns When Raised and Supported the Male Partners and PA-Cs Over the Female PA-Cs**

75.    In 2016, as part of the "merger" of the Ortho and Neuro practice groups for PA-C coverage, two leadership roles were developed: PA Organizer and PA Educator. *Ex. 19.* Initially, all PA-Cs, regardless of full-time or part-time status, were to be eligible to serve in each role on a rotating basis. *Id.*

76.    The PA Organizer earned additional compensation. *Ex. 1*, Russo Tr. 115:17-116:4.

77.    Defendants supported the male PA-Cs in excluding the two female PA-Cs, Russo and Plamondon, could not act as PA Organizer even in a shared role, because they did not work full-time. *Ex. 2*, Talbott-Kleeman Tr. 100:10- 103:1; *Ex. 8,* Deposition of Georgia Plamondon Day I, ("Plamondon I Tr.") 47:8-20.

78.    Male PA Organizers did not need to be present in the office every day to hold the position. *Ex. 2*, Talbott-Kleeman Tr. 102:18-103:2, *Ex. 15* at ¶25 ("If the scheduler is sick or on

16

vacation, arrangements are made" to cover their scheduling responsibilities).

79.   The male PA-C's used their power as PA Organizer to their advantage such as to block out time for their administrative work, leaving the female PA-C's to handle the scheduled appointments and any consults. *Ex. 75* at GP00061. In 2017, Palmer as PA Organizer stopped scheduling Russo in surgery altogether, and she had to plead with him to be put back into the rotation. *Ex. 20*.

80.   If a female PA-C had a complaint or concern with how the PA Organizer was scheduling her, her only options were to bring that complaint to Talbott-Kleeman or to the male PA Organizer. *Ex. 2*, Talbott-Kleeman Tr. 106:23-107:21.

81.   Talbot-Kleeman ignored the male PA Organizers' treatment of female PA-Cs, even when it was clear that their mistreatment was gender or caregiver status related:

    a.   In October 2018, Russo complained that the male PA-C's were receiving more favorable treatment, and Talbott-Kleeman responded by telling Russo that her concerns were not valid. *Ex. 2*, Talbott-Kleeman Tr. at 176:3-178:10; *Ex. 71*.

    b.   When Talbott-Kleeman learned of a disagreement between Russo and Palmer about the number of extra days Russo was willing to commit to during her children's summer vacation, she failed to "get involved" and instead joked with office staff about it making them "want to slip the loop over your head." *Ex. 38*.

    c.   Later Palmer suggested that Russo should be required to work extra days when the Practice was shorthanded for no additional compensation, Talbott-Kleeman remained silent. *Ex. 73*.

82.   Gamble worried Russo might not "ha[ve] the stamina to do the case" and sought to replace Russo and institute a policy designating certain PA-Cs for cases. *Ex. 44; Ex. 88*.

83.   Talbott-Kleeman responded to Gamble's attempt to sideline Russo by blaming her, saying "she just likes to act like a princess" and suggesting that Russo "just needs to suck it up" – even though there was no indication Russo was even aware of Gamble's request. *Ex. 44*.

84.    Gamble also texted female PA-C Plamondon before a surgery to see if she was "up to it", noting his case was "kind of a big deal". *Ex. 84*. Gamble, had worked with Plamondon before and was **not** asking because he had performance concerns. *Ex. 11,* Gamble Tr. 69:2-10.

85.    Gamble did not raise concerns about any male PA-C's "stamina". *Ex. 11,* Gamble Tr. 68:16-22.

86.    Plamondon faced unlawful questions about her plans for marriage and children from Talbot-Kleeman when she interviewed for her position at NHNSI. *Ex. 86*, Affirmation of Georgia Plamondon ("Plamondon Aff.") ¶3. Later, Practice founder and husband to Talbot-Kleeman, Dr. Thomas Kleeman, told Plamondon he had not expected her to "make it" as an employee of NHNSI, implying this was because of her gender. *Id.* at 11; *Ex. 2,* Talbot-Kleeman Tr. 16:11-13.

87.    Female PA-C's were mistreated and marginalized for becoming pregnant:

    a.    Male PA-C Palmer accused Plamondon of becoming pregnant so she could "have the summer off." *Ex. 8*, Deposition of Georgia Plamondon Day II ("Plamondon II Tr.") 76:1-20; *Ex. 64*.

    b.    Brian Snow pressured Plamondon to disclose her pregnancy before she was ready to so Defendants could plan her replacement. *Id.* at 77:4-80:21; *Ex. 79*.

    c.    Kame McAuliffe was excluded from assisting in surgery altogether and relegated to administrative work after returning from family leave, and was not permitted to resume operating even after she returned to a full-time schedule. *Ex. 86,* Plamondon Aff. ¶13-15; *Ex. 1,* Russo Tr. 94:15-21.

88.    Talbot-Kleeman informed Plamondon that her impending maternity leave was causing members of the Practice to experience "angst". *Ex. 81* at GP00206 – GP00207.

89.    Male PA-Cs mocked each other for spending "too much time with Gina and Georgia", the female PA-Cs, when they made a mistake. *Ex. 43* at GR000064.

90.    Talbot-Kleeman was known to "hate females" and underpay them. *Ex. 65* at

GP00292; *Ex. 81*.

91.    Ahn proposed reducing the compensation of only the part-time, female PA-C's, and could not explain why he singled them out. *Ex. 42; Ex. 3*, Ahn Tr 114:17-115:11.

92.    Dr. Jenkins raised the issue of female PA-C attrition at a meeting of the Partners and his concerns were dismissed by Talbot-Kleeman. *Ex. 30* at SPBG 00246; *Ex. 27* at SPBG 00383-SPBG 00384.

93.    Female employees at NHNSI knew that they needed to be on guard with Ahn because he was likely to become unreasonably angry and target or exclude them too. *Ex. 76* at GP00065 (warning Georgia Plamondon to "protect her neck today with [Ahn]"; *Ex. 77* at GP00079 (refusing to speak to Laura Humen for months); *Ex.* 8, Plamondon Day II Tr. 71:11-17 (Plamondon's main reason for leaving NHNSI was to avoid Russo's experience).

94.    Ahn claimed to know  Russo didn't like him because of her "body language". Ahn was bothered by a picture he saw of Russo with other doctors in the Practice, because he felt she acted more warmly towards them. *Ex. 3*, Ahn Tr. 35:6-38:2. Ahn was jealous that Russo didn't want to be his friend. *Id.* at 38:7-15.

95.    Ahn is usually able to stay calm with male PA-Cs, refers to them as "buddy" and "dude"; if he fails to stay calm, he will later seek out the male PA-Cs and try to smooth things over.  *Ex. 87*, Affirmation of Timothy C. Miller ("Miller Aff.") dated September 6, 2024 at ¶19.

96.    When Ahn had a problem with Miller, he spoke to him calmly and privately. Miller Aff. ¶5-7. Then, Ahn found a solution and continued to work with Millrt, despite Miller's inexperience as a PA-C. *Id.* at ¶3, 8-9, and 19. NHNSI was aware that Ahn was willing to learn to work with male PA-C's even if he initially did not want to. *Ex. 41*.

97.    In general, Ahn trusts his PA's, he just didn't trust the part-time, female PA-C's, Russo or Plamondon. *Ex. 3*, Ahn Tr. at 56:3-8; 79:20-81:9; 99:17-100:5 ("at risk").

98. A male PA-C operating with Ahn committed an egregious error when a drain came loose while he was closing the wound, and instead of informing Ahn, he chose to continue. *Ex. 3*, Ahn Tr. 126:11-128:23. This caused a hematoma and required emergency surgery to repair. *Id.* Ahn lost trust in the male PA-C, but he "tried to use it as a learning point" and continued working with him. *Id.* 126:22-127:6; 129:1-12. PSOAF ¶44.

99. Plamondon discovered a loose drain and handled it correctly, alerting Ahn immediately so the issue could be fixed before complications arose. Plamondon Aff. ¶10.

100. In May 2018, Ahn bumped Plamondon from a surgery at the minimally invasive surgical center ("MISCNE:) in favor of male PA-C Palmer. *Ex. 83* at GP00249.

101. The MISCNE cases are the least complex surgical cases that the Practice performs. *Ex. 4*, Wang Tr. 83:3-13; *Ex. 3*, Ahn Tr. 19:1-9.

**Male Partners are Permitted to Exclude Female PA-Cs from their ORs**

102. NHNSI permitted Ahn to consistently exclude four (4) female PA-Cs from his OR or otherwise limit his working relationship with them: Russo, Georgia Plamondon, Laura Humen, and Kame McAuliffe. *Ex. 35; Ex. 41; Ex. 78* at GP00086 (Laura Humen noting her understanding that the plan was to keep her and Ahn separate); *Ex. 77* at GP00079; *Ex. 86,* Plamondon Aff. ¶13-14; *Ex. 1, Russo Tr. at 88:1-6.*

103. Ahn has provided contradictory explanations for excluding Russo from his OR:

> a. Ahn lost trust in Russo after she gave his patient a surgical opinion that "was inappropriate for a standard consent." *Ex. 3*, Ahn Tr. at 79:20-81:9; *but see, Id.* 91:1-12 ("I already didn't trust her…").
>
> b. Ahn "found it challenging to work with part-time PA-Cs who had been assigned to the Neuro Practice…because they were not as skilled in orthopedic surgeries and the opportunities for them to participate in orthopedic surgeries were fewer due to their part-time status." *Ex. 15* at GR000433, ¶20; *but see, Ex. 3*, Ahn Tr. 20:12-23 (noting that "there's not much difference" between a

neurosurgeon doing spine surgery and an orthopedic spine surgery); and *Id.,* 79:2-19 (Ahn had no concerns about Russo's technical performance in the OR or her skills and there were no incidents where she failed to perform to standards).

104.  Despite claiming not to trust her, Russo continued to work extensively with Ahn's patients without his direct supervision for years after he refused to let her operate with him, because NHNSI's position is that even though he could exclude her from his OR, he could not exclude him from seeing his patients in the office or on call. *See, e.g., Ex. 1*, Russo Tr. 129:9-130:4; *Ex. 4*, Wang Tr. 121:2-123:17, *Ex. 21*.

105.  NHNSI knows that the only way for a PA-C to learn what a surgeon expects of them is to operate with them. *Ex. 41*.

106.  Russo's style is described by Wang as "very assertive and headstrong". Wang also describes male PA-C Travis Palmer as being most similar to Russo. *Id.* at 87:9-16.

107.  Ahn describes his working relationship with Palmer as "good" and when he felt disrespected by Palmer, he was able to talk to him about it after and resolve the issue. *Ex. 3*, Ahn Tr. 121:17-23.

108.  Ahn claimed he did not trust Russo because a male PA-C, Matt Porter ("Porter"), complained to him when he thought Russo had avoided work (based on a report from someone else) and wanted her disciplined. 27:20-28:21, 35:1-16, 46:23-47:5.  *Ex. 10*, Porter Tr. 29:12-30:13. Porter does not recall complaining about Russo and emphatically denies ever trying to get Russo fired or disciplined. *Ex. 10*, Porter Tr. 27:10-28:7, 78:12-22.

## IV.    LEGAL ANALYSIS

### A.    <u>Standard of Review</u>

Summary judgment is not appropriate when the record before the Court reveals genuine disputes as to any material fact. Fed. R. Civ. P. 56(a). Facts are material when they have the potential to affect the outcome of the suit. <u>Joseph v. Lincare, Inc.</u>, 989 F.3d 147, 157 (1st Cir.

2021). A dispute is genuine and must be decided at trial if the evidence, viewed in the light most favorable to Russo, would permit a rational factfinder to rule in favor of either party. *Id.*

"At summary judgment, 'the judge's function is not himself [or herself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" López-Hernández v. Terumo P.R. LLC, 64 F.4th 22, 28 (1ˢᵗ Cir. 2023) *quoting* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, (1986); Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 628 (1944) (the jury decides whether or not to credit testimony, "even if such testimony be uncontradicted").

**B.    Evidentiary Considerations**

> 1.    All Relevant Evidence that Can Be Presented in an Admissible Form at Trial Must be Considered.

Pursuant to Rule 402 of the Federal Rules of Evidence, all relevant evidence is admissible unless barred by the United States Constitution or a federal statute, the Rules of Evidence, or another rule of the Supreme Court. Fed. R. Evid. 402. In discrimination case, even non-actionable evidence, such as time-barred evidence, can be relevant and admissible as background as they tend to make a plaintiff's claims more likely than not and help illustrate the plaintiff's theory of the case. Malone v. Lockheed Martin, 610 F.3d 16, 22 (1ˢᵗ Cir. 2010). Evidence of a "discriminatory atmosphere" may be relevant to demonstrate NHNSI's state-of-mind at the time of Russo's termination and to evaluate pretext. Santiago-Ramos, 217 F.3d at 55; Cummings v. Std. Register Co., 265 F.3d 56, 63 (1ˢᵗ Cir. 2001).

At the summary judgment stage, documents produced by parties in response to discovery requests should be treated as authentic business records unless the other party alerted them to an issue with authenticity "before it is too late to do something about it." Joseph v. Lincare, 989 F.3d 147, 156-157 (1ˢᵗ Cir. 2021). In Lincare, the First Circuit reversed an evidentiary ruling and vacated summary judgment where the employer had successfully persuaded the District

Court to exclude some of its documents that the plaintiff had "failed to obtain an express admission of authentication" from the <u>Lincare</u> employees who created the documents. *Id.* Those documents helped push the plaintiff's case over the summary judgment hurdle and the First Circuit held they had been improperly excluded. *Id.*

> 2.  <u>Out of Court Statements are Not Hearsay When Offered for the Purpose of Discrediting a Proffered Non-Discriminatory Reason</u>

The Court has suggested that it may not allow Plaintiff to rely on the report, factual findings, or interview notes from the investigation conducted by Attorney Bailey (the contents of which can all be authenticated by Attorney Bailey at trial), even though the results and certain factual conclusions have been held out by NHNSI as determinative of the issues in this matter, and the Court itself relied on the investigator's findings in its November 22, 2024 Order awarding summary judgment to Ahn. (Doc. 64) Where, as here, out of court statements are offered not to prove the truth of those statements or any particular version of the facts, but as proof of a party's motivation for an adverse employment decision or to attack the proffered legitimate non-discriminatory reason, they are "circumstantial evidence of a relevant fact, [the employer's] []discriminatory intent, and do not constitute inadmissible hearsay." <u>Rojas-Ramirez v. BMJ Foods, Inc.</u>, 2011 U.S. Dist. LEXIS 18230, *11, 2011 WL 693621 (1ˢᵗ Cir. 2011); *see also* <u>Carmona v. Resorts Int'l Hotel, Inc.</u>, 189 N.J. 354 (2017) (internal quotations omitted) (finding "no appreciable difference" between a personnel file and an investigative report – both admissible as non-hearsay because they "bear[] on the reasonableness and good faith of defendant's conduct."; <u>Noviello v. City of Boston</u>, 398 F.3d 76, 84-85 (1ˢᵗ Cir. 2005); <u>Fahnestock v. Carlisle Reg'l Med. Ctr.</u>, 659 Fed. Appx. 75,78 (3ʳᵈ Cir. 2016) (documents are not hearsay when they are offered not to assert the truth of the statements therein, but to explain the employer's motivation for terminating the employee). Similarly, statements made by other employees recorded in the investigator's reports and notes are non-hearsay "to the extent they

are simply offered as evidence of the information submitted to [the employer] as part of an investigation." Rojas-Ramirez, 2011 U.S. Dist. LEXIS 18230, *12.

Plaintiff points to these documents to highlight inconsistencies and implausibilities in NHNSI's justification for firing her after 11 years of successful employment with an unblemished record, not as evidence of any matter asserted therein. They should be admitted.

3.    Evidence Related to Ahn Remains Relevant After Claims Against Him Were Dismissed Because Ahn is the Basis for NHNSI's Legitimate Non-Discriminatory Reason.

In this case, the only person who wanted Russo to leave NHNSI was Ahn. Ahn demanded that his Partners agree to let Russo go from the practice, or he himself would leave. Ahn is not simply a manager or supervisor employed by NHNSI; he is a Partner and part-owner who votes on the decisions of the Practice. In reviewing Russo's termination, or if we evaluate the Practice's decision to permit Ahn to exclude her from his OR, arguably another adverse employment action, NHNSI will have to refer to Ahn to come forth with a legitimate non-discriminatory reason and shift the burden of proof back to Russo. It would be prejudicial and unjust to permit NHNSI to rely on Ahn's explanations for his actions and then deny Russo the opportunity to submit evidence of "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Ahn's proffered legitimate reasons" and from which a reasonable factfinder could rationally find that Ahn's justifications are "unworthy of credence" Adamson v. Walgreens Co., 750 F.3d 73, 79 (1st Cir. 2014).

C.    **Russo Has Demonstrated Sufficient Evidence From Which a Jury May Find Pretext for Discrimination**

Although Defendants do not contest whether Plaintiff has demonstrated a *prima facie* showing, for the Court's sake, Russo avers as follows: (1) is a member of a protected class because she is female, she is also a caregiver of children, generally recognized as a subset of sex discrimination; (2) she was qualified for her job as a PA-C; (3) she suffered adverse employment

actions: she was excluded from the role of PA Organizer and from operating with Ahn, and ultimately she was terminated from her employment[4]; and (4) the circumstances of these occurrences give rise to an inference of discrimination because they only happen to female PA-Cs at NHNSI. Ripoli v. State of Rhode Island Dep't. of Human Svcs., 123 F.4th 565, 571 (1st Cir. 2024).

NHNSI has not been absolutely clear about its legitimate non-discriminatory reason, but they include:

Exclusion from Ahn's OR: Ahn (i) lost trust in Russo after speaking with Porter; (ii) lost trust in Russo after the Consent Incident, or (iii) found it difficult to work with Russo because she was part-time and he claims she wasn't as skilled and didn't have as many chances to build those skills.

Termination following the March 21, 2019 Incident: (i) Ahn and Russo had a personality conflict and could not work together, so-called "irreconcilable differences"; (ii) Russo had been disrespectful and insubordinate; (iii) the Partners could not get Ahn to agree on anything short of Russo's termination, or (iv) Russo's complaints about Ahn cutting corners and being unsafe made it clear that they could not work together.

Exclusion from the PA Organizer Role: only PA-Cs who are in the office every day can hold the position due to the nature of the responsibilities.

The First Circuit has cautioned that courts should be especially reluctant to grant summary judgment in an employer's favor in cases that require a court to inquire into an employer's motivation, because determinations of motive and intent in employment cases are better suited for a jury. Petitti v. New England Tel.& Tel. Co., 909 F. 2nd 28 (1st Cir. 1990). That is apparent in this case, where a reasonable jury could find for example, as the Court has

---

[4] Any disadvantageous change in the terms and conditions of employment may qualify as an adverse action, provided Russo can show harm, which she can. Riso v. Centerra Grp. LLC, 106 F.4th 101, 112-113 (1st Cir. 2024).

previously, that there is no difference between irreconcilable differences, personality conflicts and insubordination, but a reasonable jury might be as likely to find there is a world of difference between them since insubordination requires an intentional refusal to obey orders from your employer. *See, generally,* Cambridge Dictionary, "Insubordinate".

1.     **More Favorable Treatment of Male Employees by Ahn and by NHNSI**

In Burns and its predecessor, Thomas v. Eastman Kodak Co., 183 F.3d 38 (1st Cir. 1999), the First Circuit held that a jury might reasonably infer from evidence that Ahn becomes "inappropriately upset or angry with [Russo], to the point of behaving unprofessionally", and from his inability to respond "neutrally" to Russo, that Ahn is affected by animus or bias. Burns, 829 F. 3rd at 15-16; Thomas, 183 F.3d at 72-73. Ahn told Wang that he "blew up" at Russo when she was not immediately available to cover for him at SJH. In March 2019, Wang and Talbot-Kleeman both were hoping Ahn would "calm down" and he admitted to yelling at Russo. Ahn also admits, by his own writing, to jumping to a conclusion of passive-aggressive work avoidance, when Russo said, *according to him*, "I'm at CMC, so do you want me to go home and do this, or do you want me to walk you through it so you can do it yourself". There is nothing in these words that makes them obviously unprofessional or indicates work avoidance. Further, Ahn's own statement about the incident did not accuse Russo of even having an inappropriate tone or raised voice until *after* he accused her avoiding work, which Russo asserts was done by yelling at her. A reasonable jury could infer that Ahn's explanation and, indeed, his reaction to Russo's response, establish a dispute of material fact that precludes summary judgment because only a jury can decide whether these words are unprofessional or if Ahn perceived them this way because Russo, a woman, said them. Lipsett, 864 F.2d 881, 905 (1st Cir. 1988).

Ahn's exclusion and lack of faith in female PA-Cs in his operating room, where he did not

experience a similar or equivalent failure with male PA-Cs – even those who literally failed – is further compelling evidence from which a jury could find disparate treatment on the basis of sex. Molloy v. Blanchard, 115 F.3d 86, 92 (1st Cir. 1997). Similarly, Ahn's ability to appreciate behavior in Palmer but not in the female PA-C whose style most closely resembles him is evidence of pretext.

2.    **Evidence That Russo Was a High-Performing and Highly Regarded Employee is Sufficient to Infer Pretext**

Russo's extended record of excellent performance, history of bonuses and raises, and in particular, Ahn's own evaluations of her work performance in the time-frame of the incidents he claim caused him to lose trust in her, not want to work with her and deem her to be unprofessional and work avoidant, are all significant evidence of pretext.  See Burns, 829 F.3d at 29 ("A reasonable jury could find it highly suspect that despite these indicia of high job performance, Johnson persisted in challenging Burns's alternative schedule.")

It is not disputed that NHNSI sought to have Russo remain employed for three additional months even after they decided to acquiesce to Ahn's demand. In December 2018, Russo was getting a bonus and Talbot-Kleeman wanted to hear if she had any needs or suggestions; three months later, she was being fired after 11 years of employment. The circumstances of Russo's termination are sufficiently implausible and inconsistent with her employment history for a jury to find pretext for discrimination.

3.    **Evidence of Stereotyping Cannot be Ignored**

Even subtle reflections of discriminatory attitudes obligate the Court to afford Russo the relief provided by Title VII and by extension, RSA 354-A. Thomas v. Eastman Kodak Co., 183 F.3d 38, 59-60 (1st Cir. 1999). Ahn's assumptions about Russo, endorsed and adopted by NHNSI even though the rest of the Partnership almost universally disagrees, are so subjective in nature that they invite stereotyping and are difficult to challenge. The Supreme Court has held

27

in cases such as this, where subjective factors – here tone of voice and a perceived passive-aggressive work avoidance that only Ahn has detected – "the employer should be able to present some objective evidence as to its probable decision in the absence of an impermissible motive' should be adopted." Hopkins v. Price Waterhouse, 920 F.2d 967, 973 n. 3 (D.C.Cir.1990) (quoting with approval Radford, Sex Stereotyping and the Promotion of Women to Positions of Power, 41 Hastings L.J. 471, 533 (1990)).

Ahn admits that he did not like Russo because he felt she was not friendly enough with him or as warm or friendly towards him as she was towards other doctors. When Ahn asserts his observations about Russo's perceived lack of warmth toward him as evidence for his belief that Russo was resistant to performing his work, and admits that he didn't like Russo because he wasn't included in the small group of doctors she was friendly with, he is demonstrating that he holds an expectation regarding female employee's behavior toward him. Wang observed that Plaintiff's was "very assertive" and her style is most similar to male PA-C Palmer, yet Ahn did not experience these same conflicts with Palmer's style. Combined with Ahn's pattern of behavior when he senses female opposition to him, this is compelling stereotype evidence. A jury may easily find that all of Ahn's interactions with Russo reflect his bias on how woman should behave. Lipsett, 864 F.2d at 909 (reversing summary judgment where there was evidence the employer believed women should be submissive and not assertive); Price Waterhouse v. Hopkins, 490 U.S. 228, 249 (1989) (recognizing employers may act on sex-based stereotypes of how women should act).

**D.** **There is Significant Evidence of Prohibited Post-Termination Retaliation[5]**

---

[5] In the absence of direct evidence, a *prima facie* case of retaliation is made by a showing that: (1) the employee engaged in conduct that Title VII protects; (2) the employee suffered an adverse employment action; and (3) the adverse action is causally connected to the protected activity. Hernandez-Torres v. Intercontinental Trading, Inc., 158 F.3d 43, 47 (1st Cir. 1998). While this case is arguably a direct evidence case with Talbot-Kleeman's multiple written admissions, even under a burden-shifting paradigm, Plaintiff has met her burden.

Defendants had proposed that Russo remain employed for three (3) additional months, and then continue working at HCNH indefinitely before they received her Demand Letter and within days, altered the course and terminated her employment, and took steps to block her employment prospects by refusing references including official employment confirmation requests directly from hospitals. Defendants face liability not only for their post-employment conduct, but for any retaliation that occurred after they notified Russo of the Partner's decision, but before a final departure date was set. *See* <u>Connell v. Bank of Boston</u>, 924 F.2d 1169, 1179 (1st Cir. 1991) (affirming that post-employment conduct can form the basis of a retaliation claim and noting that if an employee suffers an adverse consequence, retaliation where a termination decision was made but the termination date is not already "irrevocably decided," is also actionable).

There can be no serious dispute here about whether retaliation motivated the decision to terminate Russo's employment on May 2, 2019, where Talbot-Kleeman wrote that Defendants had accelerated Russo's termination because Russo was "making allegations that are unacceptable and demanding a large sum of money" and made the termination decision the day after receiving Russo's Demand Letter. Indeed, the evidence is clear that prior to her allegations, NHNSI wanted Russo to continue working three additional months, were willing to pay her $15,000 in severance, and wanted her to continue working at HCNH. The evidence is also clear that Russo could have continued at HCNH indefinitely without interacting with Ahn, and it was her allegations that prompted NHNSI to withdraw that opportunity.

NHNSI's claims regarding its "policy" on references do not withstand scrutiny where multiple Partners testified that the prohibition on references for Russo had never happened to any other employee, and where it continued into June 2019, long after the possibility for any agreement on termination reasons with Plaintiff had lapsed by NHNSI's decision to abruptly

terminate her employment and claim it was for cause (insubordination). Due to the nature of the business and the need to be credentialed, NHNSI took these actions understanding that they could prevent Russo from being employed. Refusing to provide a recommendation is without question an adverse employment action. *See* EEOC Compliance Manual §8-II(D)(2) ("Examples of post-employment retaliation include actions that are designed to interfere with the individual's prospects for employment such as . . . refusing to provide a job reference, and informing an individual's prospective employer about the individual's protected activity . . . .").

**E.    Collateral Estoppel Is Not Appropriate Where The Same Questions Were Not Previously Before the Court**

Collateral estoppel only applies where: (i) the issue subject to estoppel is identical in each action; (ii) the first action resolved the issue finally on the merits; (iii) the party to be estopped appeared in the first action or was in privity with someone who did; (iv) the party to be estopped had a full and fair opportunity to litigate the issue; and (v) the finding at issue was essential to the first judgment. 412 South Broadway Realty, LLC v. Wolters, 169 N.H. 304, 314 (2016).

This issue turns on notice. As the Court previously found, "Dr. Ahn's motion for summary judgment and supporting memorandum address the claims brought against Dr. Ahn but do not address the claims brought against the Institute." Order, November 15, 2024 (Doc. 63). On that basis, the Court determined NHNSI's "joinder" ineffective to include NHNSI, and confirmed that it "would consider the motion for summary judgment only with respect to the moving party, Dr. Ahn." *Id.* Because the remaining claims before the Court today are different than those litigated by Ahn, Plaintiff was not on notice that she was litigating them and could not have had a full and fair opportunity to litigate her claims against NHNSI in the Ahn Motion. Under these circumstances, where Russo has not had a chance to fully explore and argue the subjects before the Court, she cannot be deemed to have met the criteria for collateral estoppel. *Id.* NHNSI's request for estoppel should be

denied.

**F.    NHNSI Has Identified Plaintiff's Protected Activity in Support of Their Legitimate Non-Discriminatory Reason**

NHNSI included among its justifications for terminating Russo in spite of her long history of excellent performance, Russo's report of Ahn being lazy and cutting corners when treating patients, which created problems in the Practice. Thus, NHNSI's own admissions establish a causal link between Russo's protected activity of reporting Ahn's substandard patient care and her wrongful termination. Given this admission, a reasonable jury might infer that NHNSI was motivated by the requisite bad faith, malice, or retaliation when they terminated her employment. The existence of a public policy is a question best left to the jury. Cloutier v. Great Atl. & Pac. Tea Co., 121 N.H. 915, 924 (1981).

NHNSI's history of ignoring these safety concerns when Russo raised them, such as when she attempted to seek assistance from Luther and Jenkins following the Consent Incident, and Ahn's demand that she violate her ethical obligations when dealing with his patients, and his history of lashing out at Russo when she pointed out a patient safety issue, such as when she suggested that he would be able to get to the urgent patient at St. Joseph's Hospital sooner, when she was busy with a coding patient at a different hospital, only serve to underscore the severity of NHNSI's problem and the public safety threat Ahn's behavior creates.

For the foregoing reasons, NHNSI is not entitled to summary judgment.

Dated: February 26, 2025                Respectfully submitted,

                                        GINA RUSSO
                                        By her attorney:


                                        ___/s/ Kamee Verdrager_____
                                        Kamee Verdrager, Esq. (NH #21266)
                                        KBV LAW

P.O. Box 90
W. Nottingham, NH 03291
(603) 488-1473 (phone)
kbv@kbvlawpc.com

**CERTIFICATION**

I hereby certify that on this day a copy of the foregoing was served via CM/ECF on counsel of record.

__/s/ *Kamee Verdrager*_____
Kamee Verdrager