UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Gina Russo

    v.                        Case No. 21-cv-703-SM-TSM
                                Opinion No. 2025 DNH 056
New Hampshire Neurospine
Institute, P.A. and Uri M. Ahn

## **Memorandum Order**

Gina Russo brought claims against her former employer, New Hampshire Neurospine Institute, P.A. ("Institute"), and a surgeon in that practice, Uri M. Ahn.  After granting summary judgment in favor of Dr. Ahn, the court granted the Institute an opportunity to move for summary judgment on Russo's claims against it.[1]  The Institute filed its motion, and Russo objected.  For the reasons that follow, the Institute's motion for summary judgment is granted.

## Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Facts are material when they have the potential

---

[1] The Institute unsuccessfully attempted to join Dr. Ahn's motion for summary judgment, which was explicitly limited to the claims against him.  Doc. no. 63, at 1.

to affect the outcome of the suit under the applicable law . . . [a]nd a dispute is genuine when the evidence is such that a reasonable jury could resolve the point in favor of the nonmoving party." Quintana-Dieppa v. Dep't of Army, 130 F.4th 1, 7 (1st Cir. 2025).  The court takes the facts in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  Rodrique v. Hearst Commns., Inc., 126 F.4th 85, 89 (1st Cir. 2025).

## Background

Gina Russo began working at the New Hampshire Neurospine Institute as a physician's assistant ("PA") in March of 2008. Dr. Ahn is an orthopedic surgeon and a partner at the Institute. Until 2016, the orthopedic surgery and neurosurgery sections of the practice operated separately.  Russo worked part-time in neurosurgery.

After the two practice sections merged, staff worked with surgeons in both sections, and, as a result, Russo began to work with Dr. Ahn.[2]  The record evidence establishes that Dr. Ahn and Russo had a strained relationship.  Dr. Ahn thought that Russo generally tried to avoid work and specifically tried to avoid

---

[2] The PAs do their own scheduling, but only full-time PAs serve as scheduler for PAs.  Russo was excluded from that position because of her part-time status.

working with him.  For her part, Russo thought that Dr. Ahn was lazy and cut corners.

Between 2016 and early 2019, three incidents occurred in which Dr. Ahn thought Russo acted unprofessionally and was rude and insubordinate.  Russo thought that she acted appropriately under the circumstances.

(1) In October of 2016, Dr. Ahn called Russo and asked her to see a patient of his at St. Joseph's Hospital in Nashua.  At the time, she was attending another surgeon's patient at Elliott Hospital in Manchester.  Russo told Dr. Ahn she could not leave the patient at Elliott Hospital, which Dr. Ahn found to be unhelpful and disrespectful.  Dr. Ahn also did not believe Russo's given reasons for not immediately going to St. Joseph's Hospital until he confirmed the circumstances with the surgeon involved at Elliott Hospital.

(2) During the summer of 2017, Russo was in a preoperative meeting with Dr. Ahn's patient, for the purpose of obtaining informed consent to scheduled surgery. The patient asked Russo about reducing the risk that he would need additional surgeries.  Russo sought out and consulted with a different surgeon, Dr. Luther, about possible alternatives to the procedure planned and scheduled by Dr. Ahn.  Russo then advised the patient that

Dr. Luther thought an alternative was plausible.  The
patient's wife then called Dr. Ahn and asked about changing
the procedure, requiring Dr. Ahn to further explain and
justify the procedure he planned.  Dr. Ahn told (and may
have yelled at) Russo that her interaction with the patient
was not appropriate.

(3) On March 9, 2019, Dr. Ahn called Russo and asked her to
help him discharge a patient at Elliott Hospital.  Russo
was at Catholic Medical Center.  Russo asked Dr. Ahn
whether he wanted her to go to Elliott Hospital or talk him
(Dr. Ahn) through the discharge process.  Dr. Ahn took
exception to her reaction, and they engaged in a heated
exchange in which both raised their voices.

After the second incident, when Russo suggested an alternative
surgical procedure to Dr. Ahn's patient without first consulting
him, Dr. Ahn decided that he did not want Russo to work with him
in the operating room.  After the third incident, Dr. Ahn
decided that he would not work with Russo at all.

At a board meeting on March 25, 2019, Dr. Ahn presented his
case, arguing that Russo had been disrespectful, insubordinate,
and difficult to work with, and, he said, he would leave the
practice unless the partners voted to terminate her employment.
Faced with that choice, the partners voted unanimously to

terminate Russo's employment, although not all the partners agreed with Dr. Ahn's presentation or his assessment of Russo.

Anne Talbot-Kleeman, the Institute's executive director, notified Russo of the partners' vote the next day.  Russo continued working for the Institute during a transition period, during which Russo and the Institute discussed a potential severance payment and her continued work with an Institute physician at the Hillsborough County Nursing Home as an independent contractor.  That period ended on May 2, 2019, after the Institute received her attorney's demand letter alleging gender discrimination and seeking $100,000 in damages.  She began a new job in July of 2019.

Russo brought suit against Dr. Ahn and the Institute.  The court granted summary judgment in favor of Dr. Ahn on the claims against him.  Three claims remain against the Institute:  gender discrimination in violation of Title VII and RSA ch. 354-A (Count I);[3] retaliation in violation of Title VII and RSA ch. 354-A (Count II); and common law wrongful termination (Count IV).

---

[3] The reference to Title VII is to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., and the reference to RSA ch. 354-A is to New Hampshire's Law Against Discrimination, New Hampshire Revised Statutes Annotated Chapter 354-A.

Discussion

The Institute moves for summary judgment on the claims against it.  In support, the Institute initially asserts that the court's order granting summary judgment in favor of Dr. Ahn estops Russo from opposing summary judgment on the discrimination claim.  The Institute also asserts that it neither retaliated against Russo nor wrongfully terminated her and that Russo cannot show a triable factual dispute on either claim.  Russo objects to summary judgment, arguing that material factual disputes preclude summary judgment in favor of the Institute.

A.  Count I - Discrimination

In Count I, Russo alleges that the Institute discriminated against her because of her gender in violation of Title VII and RSA ch. 354-A.[4]  She alleges, "Ahn, her supervisor, engaged in stereotypical thinking toward women and subjected Russo to disparate treatment and hostility because of her gender and [the Institute], aware of this unlawful behavior, further caused

---

[4] Under New Hampshire law, the court relies on federal cases, interpretating Title VII, to decide analogous discrimination claims under RSA ch. 354-A.  Zerveskes v. Wentworth-Douglass Hosp., No. 24-cv-025-SE-TSM, 2024 WL 4301375, at *2 (D.N.H. Sept. 26, 2024) (citing Hubbard v. Tyco Integrated Cable Sys., Inc., 985 F. Supp. 2d 207, 218 (D.N.H. 2013)).

Russo to experience an adverse employment action because Ahn demanded it." Doc. no. 1, at 21, ¶ 102. As such, Russo's discrimination claim is premised on Dr. Ahn's treatment of her and the Institute's decision to terminate her employment in response to Dr. Ahn's request.

### 1.  Collateral estoppel and law of the case

The Institute, in support of its motion for summary judgment on the discrimination claim in Count I, argues that the court found in the prior order, granting summary judgment in favor of Dr. Ahn, that the Institute did not discriminate against Russo.[5]  The Institute further argues that Russo is now collaterally estopped from asserting that the Institute discriminated against her, based on the prior summary judgment order.  The Institute, however, is mistaken.

Russo alleged that Dr. Ahn aided and abetted the Institute in discriminating against her.  To preclude summary judgment on that claim, Russo had to demonstrate that there was at least a material factual dispute as to whether Dr. Ahn aided and abetted

---

[5] The Institute also relies on the report provided by an independent investigator, Elizabeth Bailey, who investigated Russo's allegations of gender discrimination.  Bailey concluded that while Dr. Ahn and other surgeons may have acted unprofessionally, their conduct did not show gender bias.  The court does not consider Bailey's report or her conclusions, which are likely inadmissible hearsay on the question of gender bias by the Institute and its employees.  See Fed. R. Evid. 801; Fed. R. Civ. P. 56(c)(2).

the Institute in discriminating against her.  Doc. no. 64, at

13-19.  The court concluded that based on the scant evidence

presented for purposes of Dr. Ahn's motion for summary judgment,

Russo did not meet that burden and granted summary judgment in

Dr. Ahn's favor.  Id.

The court made no finding that the Institute did not

discriminate against Russo.[6]  Instead, the court concluded that,

based on the evidence presented for purposes of Dr. Ahn's

motion, Russo failed to establish at least a genuine and

material factual dispute as to whether the Institute

discriminated against her, which was necessary to maintain the

aiding and abetting claim against Dr. Ahn.  The court's prior

order does not provide the factual support that the Institute

ascribes to it.  The Institute's motion is separate from Dr.

Ahn's motion and requires its own evidentiary support.

Further, collateral estoppel applies only when a court has

determined an issue in a prior action by a valid and binding

final judgment.[7]  Ramallo Bros. Printing v. El Dia, Inc., 490

---

[6] "[T]he summary judgment standard requires the trial court
to make a legal determination rather than to engage in
factfinding. . . ."  United Paperworkers Int'l Union Loc. 14,
AFL-CIO-CLC v. Int'l Paper Co., 64 F.3d 28, 31 (1st Cir. 1995).

[7] The Institute cites New Hampshire cases for the collateral
estoppel standard.  When the decision to be given preclusive
effect is federal, however, the federal standard applies.
Faigin v. Kelly, 184 F.3d 67, 78 (1st Cir. 1999).

F.3d 86, 90 (1st Cir. 2007).  The prior summary judgment order

that the Institute relies on here is an interlocutory order

addressing claims against one of two defendants in an open case,

not a final judgment.  See Davis v. Lehane, 89 F. Supp. 2d 142,

147 (D. Mass. 2000) (explaining that interlocutory orders are

not final and are subject to revision and amendment).  No valid

and binding final judgment has been issued in this case, which

prevents the summary judgment order from having preclusive

effect at this time.[8]

The Institute also mentions the law-of-the-case doctrine as

a basis for precluding further factual development of Russo's

---

[8] The Institute asserts that collateral estoppel can also
apply between parties within the same case, but the case it
cites, Merrimack St. Garage, Inc. v. Gen. Motors Corp., 667 F.
Supp. 41, 44 (D.N.H. 1987), does not support that theory.
Instead, the issue presented there was whether remand following
appeal "opens the door for counsel to bring forth new theories
of recovery, even though the cause of action is unchanged."  The
plaintiff argued that res judicata did not apply on remand.  The
court wrote:

> The fact that a case is remanded for further proceedings
> does not automatically render res judicata attachment
> inapplicable. Absent unusual circumstances, a judgment
> affirmed is final for res judicata purposes as to those
> parts of the action no longer subject to litigation; that
> is, determination of a cause of action is final and binding
> as to matters affirmed by a court of appeals regardless
> that litigation might continue on some limited matters
> directly related thereto.

Id.  A case is appealed after final judgment is entered, which
gives rise to res judicata.  Here, no final judgment has been
entered.  Therefore, the reasoning in Merrimack Street Garage is
inapposite to the question of whether the summary judgment order
could have preclusive effect here.

discrimination claim.  "The law-of-the-case doctrine generally provides that 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'"  B.R.S. Real Est., Inc. v. Certain Underwriters at Lloyd's, London, 110 F.4th 442, 447 (1st Cir. 2024) (quoting Musacchio v. United States, 577 U.S. 237, 244-45, (2016)); Pérez-Ruiz v. Crespo-Guillén, 25 F.3d 40, 42 (1st Cir. 1994) ("Interlocutory orders, including denial of motions to dismiss, ... do not constitute law of the case.").  Because the Institute appears to invoke the law-of-the-case doctrine to establish facts, not law, it has not shown the doctrine applies to preclude Russo's discrimination claim against the Institute.

Neither collateral estoppel nor law-of-the-case doctrine establishes facts pertaining to whether the Institute discriminated against Russo for purposes of the Institute's motion for summary judgment.  For that reason, the court's prior summary judgment order does not establish facts for purposes of the Institute's motion for summary judgment.

### 2.  Merits

The Institute argues that it is entitled to summary judgment on Russo's discrimination claim.  It asserts that the record establishes that the partners voted to terminate Russo only to avoid Dr. Ahn's resignation from the practice.  The undisputed evidence shows that, based on Dr. Ahn's presentation

at the board meeting and the partners' discussion, while some partners did not share Dr. Ahn's opinion of Russo, they concluded there was no arrangement in which Russo and Dr. Ahn could both remain in the practice.[9]  Russo contends, however, that Dr. Ahn's presentation against her was false and was based on his discriminatory animus rather than on legitimate reasons to terminate her employment.

### a.  Dr. Ahn's discriminatory intent

Russo contends, as she did in opposing Dr. Ahn's motion for summary judgment, that the court may infer from Dr. Ahn's behavior that he "is affected by animus or bias."  Doc. no. 86-1, at 26.  Russo, however, has not established that Dr. Ahn's

---

[9] Talbot-Kleeman (the Institute's executive director) testified at her deposition as follows about the discussion and vote by the partners:

> Everyone gave their verbal opinion of the situation and whether they had further feedback about the situation and it was unanimous that there was no other alternative. These two individuals had to work together in some capacity. There was no way to pull Gina [Russo] completely away from working with Dr. Ahn and also to a degree there would be some undercurrent of there being a situation of her feeling that this doctor was, in her words, lazy, cut corners, spent five minutes with patients. Things like that that she said and along the lines of I'll never apologize and I just couldn't envision a manner in which a person with that feeling about one of our medical providers would work in the same environment with them whether she was seeing their patients directly or not.

Doc. no. 83-2, at 11.

alleged discriminatory animus is attributable to the Institute
in the circumstances she describes.  As part of her statement of
facts, Russo asserted, without citation to any evidence or legal
authority, that "because Ahn, a NHNSI Partner, is an agent of
NHNSI, who acted as both a decision-maker and someone who
influenced the employment decisions at issue [ ], all
allegations regarding Ahn are, as a matter of law, also
allegations concerning the Practice."  Doc. no. 86-1, at 3.
Based on the record and argument presented, Russo has not shown
that the Institute is liable for any discriminatory animus that
might be attributable to Dr. Ahn.  Despite that omission, the
court will consider Russo's discrimination theory, assuming
without deciding that Russo could establish that the Institute
shared or was liable for Dr. Ahn's alleged discriminatory bias.

### (1) Cat's paw liability

Although she does not identify it as such, Russo may have
intended to present a "cat's paw" theory of liability.  Under a
cat's paw theory, "an employer can be held liable when a
decision-making official [like the Institute] relies on false
information that is manipulated by another employee who harbors
illegitimate animus to take an adverse employment action."
Brandt v. Fitzpatrick, 957 F.3d 67, 79 (1st Cir. 2020); see also
Donovan v. Nappi Distributors, 703 F. Supp. 3d 135, 262 (D. Me.
2023).  That is, "cat's paw liability can attach if an employee

12

performs an act motivated by animus that is intended to cause an adverse employment action, and if that act is a proximate cause of an adverse employment action." Ameen v. Amphenol Printed Circuits, Inc., 777 F.3d 63, 70 (1st Cir. 2015) (citing Staub v. Proctor Hosp., 562 U.S. 411 (2011)).

Here, however, as presented, the partners did not rely on the "truth" of Dr. Ahn's presentation against Russo, and did not vote to terminate her employment based on acceptance of his perception or the information he provided. Instead, whether they believed Dr. Anh's presentation to be true or not and whether they considered Russo culpable or not, they voted unanimously to terminate Russo because of the choice Dr. Ahn presented: if they did not terminate Russo's employment, he would leave the practice. As such, the Institute did not rely on false information provided by Dr. Ahn about Russo to make the decision to terminate her employment.

### (2) Biased conduct

Russo relies on the analyses in Burns v. Johnson, 829 F.3d 1, 15-16 (1st Cir. 2016), and Thomas v. Eastman Kodak Co., 183 F.3d 38, 64 (1st Cir. 1999), to show that Dr. Ahn could be found to be biased against her based on her gender. Specifically, Russo contends that Dr. Ahn was "'inappropriately upset or angry with [Russo], to the point of behaving unprofessionally.'" Doc. no. 86-1, at 26 (quoting Burns, 829 F.3d at 15-16 (quoting

Thomas, 183 F.3d at 64)).  In Burns, the plaintiff's supervisor
demonstrated antipathy toward her from the time the supervisor
arrived, gave her negative job performance assessments when her
assessments from others were highly positive, did not recognize
her noteworthy accomplishments, and wielded a baseball bat
around the plaintiff in an "intimidating manner."  829 F.3d at
15-16.  In Thomas, the plaintiff was the only black employee
when a new white manager arrived.  She then received much lower
evaluations than she had previously, and the manager became
inappropriately upset with the plaintiff at times.  183 F.3d at
64.  The supervisors in those cases generally behaved badly
toward the plaintiffs without apparent explanatory provocation
or reason, other than the inferred reason of their gender or
race.

Here, Russo points to the incident in October of 2016 when
she was attending a patient at Elliott Hospital and Dr. Ahn
called to ask her to leave in order to see an urgent patient of
his at Saint Joseph's Hospital.  That interaction devolved into
a heated exchange between Russo and Ahn, in which raised voices
were used.  Russo argues that the incident shows that Dr. Ahn
overreacted, which could support an inference that Dr. Ahn was
biased against her because she is female.

The court disagrees.  Unlike the circumstances in Burns and
Thomas, where the supervisors generally and without provocation

14

or arguable cause behaved inappropriately and badly in interacting with an employee, here Dr. Ahn reacted to a particular situation involving his request for help from Russo for his patient.  Whether he "overreacted" to Russo's reaction to his request or not, there were apparent and sufficient nondiscriminatory reasons for Dr. Ahn's reaction.  Russo does not point to any evidence of pretext, and that incident does not support an inference of gender bias.

Russo also asserts, without citation to record evidence, that "Ahn's exclusion and lack of faith in female PA-Cs in his operating room, where he did not experience a similar or equivalent failure with male PA-C – even those who literally failed - is further compelling evidence from which a jury could find disparate treatment on the basis of sex."  Doc. no. 86-1, at 26-27.  The citations Russo provided in her factual statement demonstrate that Dr. Ahn did not want to operate with Russo as the PA, which is undisputed.  But, the other referenced evidence does not support Russo's theory that Dr. Ahn excluded all female PAs from working with him in the operating room.[10]  Russo's

---

[10] For example, several documents are excerpts of text messages that Russo's counsel identifies as exchanges between Laura Humen and Georgia Plamondon, who apparently were PAs at the Institute between 2016 and 2019.  The cited pages show that Humen and Plamondon were critical of some of the conditions of their employment and of some of the surgeons, but that evidence does not show that Humen or Plamondon were excluded from operating with Dr. Ahn because of their gender.

opinion about Dr. Ahn's biases without pointing to supporting evidence does not provide a competent basis for an inference of disparate treatment.  Russo has not demonstrated a factual basis for finding pretext based on disparate treatment.

### b.  Pretext

Russo argues that the Institute's given reasons for her termination were pretexts for discrimination.  A plaintiff opposing summary judgment on a Title VII discrimination claim may rely on the McDonnell Douglas burden-shifting framework to support the claim.[11]  Ripoli v. Dep't of Hum. Servs., Off. of Veterans Servs., 123 F.4th 565, 571 (1st Cir. 2024).  "Under that framework, the plaintiff in a discrimination case first must make a prima facie showing of discrimination . . . [by] establish[ing] that she was a member of a protected class, that she was qualified for the job, that she suffered an adverse employment action, and that the adverse employment action transpired under circumstances giving rise to an inference of discrimination."  Id. (internal quotation marks and citations omitted).

"Once the plaintiff carries her burden of showing a prima facie case, the burden of production shifts to the defendant,

---

[11] McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03, (1973).

who must provide a legitimate, non-discriminatory reason for the adverse employment action." Id. at 572. "As long as the defendant is able to put forth such an explanation, the burden then reverts to the plaintiff to show that the defendant's stated reason for the adverse action was a pretext for discrimination." Id. "Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Id. (internal quotation marks omitted).

Russo gives her prima facie case only cursory mention, and instead focuses on whether the Institute's stated reasons were pretextual.[12]  She contends that the Institute imposed a series of adverse employment actions against her and gave pretextual reasons when the real reason for those actions was that she is female.

A plaintiff may demonstrate pretext, which provides a basis for inferring unlawful discrimination, by showing that the reasons given by the employer for an adverse action are false.

---

[12] The strength of a plaintiff's prima facie case may tip the evidentiary balance in favor of the plaintiff. Ripoli, 123 F.4th at 572.  Russo, however, does not rely on the strength of her prima facie case.

Ripoli, 123 F.4th at 575.  "Pretext [also] can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Sutherland v. Peterson's Oil Serv., Inc., 126 F.4th 728, 741 (1st Cir. 2025) (internal quotation marks omitted); Cocuzzo v. Trader Joe's E. Inc., 121 F.4th 924, 935 (1st Cir. 2024).

Russo identifies the following adverse employment actions and lists the Institute's reasons that she believes were pretextual, as follows:

> Exclusion from Ahn's OR: Ahn (i) lost trust in Russo after speaking with Porter [a PA in the practice]; (ii) lost trust in Russo after the Consent Incident, or (iii) found it difficult to work with Russo because she was part-time and he claims she wasn't as skilled and didn't have as many chances to build those skills.

> Termination following the March 21, 2019 Incident: (i) Ahn and Russo had a personality conflict and could not work together, so-called "irreconcilable differences"; (ii) Russo had been disrespectful and insubordinate; (iii) the Partners could not get Ahn to agree on anything short of Russo's termination, or (iv) Russo's complaints about Ahn cutting corners and being unsafe made it clear that they could not work together.

> Exclusion from the PA Organizer Role: only PA-Cs who are in the office every day can hold the position due to the nature of the responsibilities.

Doc. no. 86-1, at 25.[13]  Russo contends that the Institute's
reasons for the adverse actions she identifies are unworthy of
credence because Dr. Ahn and the Institute treated male
employees more favorably than female employees, because Russo
was high performing and highly regarded, and because of
stereotyping.[14]

(1) Exclusion from the operating room

To the extent exclusion from working with Dr. Ahn in the
operating room was an adverse employment action against Russo,
the reasons that she cites and attributes to Dr. Ahn do not
demonstrate pretext for gender discrimination.  The cited
reasons are consistent among themselves and fully plausible.

---

[13] Russo provides no citations to the summary judgment
record or to her factual statement to show that the Institute
gave those reasons for the listed adverse actions.  Russo
provided 108 paragraphs in her factual statement and filed 100
exhibits.  The court generally would decline to search through
the factual statement and exhibits to find evidence that Russo
does not specifically cite in support of her arguments.  See
Tutor Perini Corp. v. Banc of Am. Sec. LLC, 842 F.3d 71, 85 (1st
Cir. 2016) ("Judges, after all, are not like pigs, hunting for
truffles buried in the record.") (internal quotation marks
omitted).  Nevertheless, the court will assume that Russo has
presented or could present evidence to support these assertions.

[14] In her surreply, Russo cites evidence to show that she
was not terminated because of unprofessional and insubordinate
conduct.  She is correct, and it appears to be undisputed that
the Institute terminated her employment because Dr. Ahn told the
partners that he would leave the practice if Russo stayed.
Russo has not cited evidence to demonstrate that the Institute's
reason was pretextual.

Russo's different view of her conduct and performance does not make the nondiscriminatory reasons given by (or attributed to) the Institute either false or so weak as to support an inference of pretext.

### (2) Termination

The reasons Russo attributes to the Institute for her termination are also not weak or false.  Dr. Ahn gave his reasons to the partners explaining why he would no longer work with Russo.  Whether those reasons are weak, true, or false, it is undisputed that those were the reasons he gave.  It is also undisputed that Dr. Ahn would not agree to an arrangement other than Russo's termination, and the partners and Talbot-Kleeman were unable to devise another plan that would allow both Russo and Dr. Ahn to remain in the practice.  Russo's complaints about Dr. Ahn further support the Institute's explanation that she was terminated because her continued employment was untenable, given the unworkable relationship between her and Dr. Ahn, and his refusal to work with her.  Russo has not shown that the attributed reasons support an inference of pretext.

### (3) PA scheduling

Russo also asserts that her exclusion from the role of organizing the schedule for the PAs was an adverse employment action.  She contends that the Institute's stated reason for excluding her from that role, because she worked part-time, was

not clear and was a pretext for discrimination based on her

gender.  In response, the Institute demonstrated that a full-

time female PA held the scheduling position at one time and that

the part-time restriction was not gender-based.  Russo fails to

point to evidence to show a factual dispute as to whether the

restriction of the scheduling position to full-time PAs was a

pretext for discrimination against female PAs.[15]

### d.  Performance

Russo contends that her record of high performance and her

history of bonuses and raises support her argument that Dr. Ahn

was biased against her because of her gender and not because of

her performance.  There is no dispute that Russo was a valued

employee who received excellent performance evaluations and

commensurate bonuses and raises.  The Institute has not

suggested that Russo's employment was terminated because of her

skill level or her performance evaluations.  She was terminated

because Dr. Ahn told his partners that, given his interaction

with Russo, the friction between them, and his disapproval of

---

[15] Russo inappropriately includes argument in her factual
statement.  See LR 56.1.  Her arguments and theories about
discriminatory treatment of female PAs in the factual statement
are not cited in support of the relevant part of her memorandum.
Compare doc. no. 86-1, at 16-20 with doc. no. 86-1, at 24-28.
In any event, she simply does not point to evidence of pretext
or discriminatory animus with respect to her discharge or her
work assignments or conditions.

her behavior toward him, he would not work with her and he would leave the practice if she were not terminated.  Nothing about Russo's skill and performance as a PA shows that the reason for terminating her employment was a pretext for gender discrimination, rather than the poor working relationship she had with Dr. Ahn, and his unwillingness to remain within the practice if she continued.

### e.  Stereotyping

Russo asserts, again without pointing to record evidence or to particular paragraphs or parts of her factual statement, that Dr. Ahn's "assumptions about Russo, endorsed and adopted by [the Institute] even though the rest of the Partnership almost universally disagrees, are so subjective in nature that they invite stereotyping and are difficult to challenge."  Doc. no. 86-1, at 27.  She further asserts that the Institute lacked any objective evidence to support the reason for firing her and instead relied only on Dr. Ahn's subjective factors.  She speculates that Dr. Ahn had a stereotyped expectation of how women in general should behave toward him, that is, that women should not be assertive.  Because Russo was assertive and that conflicted with stereotypical assumptions attributed to Dr. Ahn, Dr. Ahn was necessarily biased against her because of her gender.

Russo points to no evidence of Dr. Ahn's alleged stereotypical views of women in general, but the proffered evidence suggests that the Institute's decision to terminate Russo's employment was based on the choice Dr. Ahn presented at the board meeting, based on his perceptions of Russo's rudeness, unprofessionalism, and insubordination. Russo does not dispute that Dr. Ahn presented his reasons for not wanting to work with Russo to his partners at the meeting or that he stated he would leave the Institute unless she was terminated. Even if Dr. Ahn misunderstood or misperceived the incidents that lead to his conclusions about Russo and, even if he was utterly wrong about Russo having been insubordinate, the partners were not asked to vote based on those given reasons. Instead, the record shows that the partners voted to terminate Russo's employment so that Dr. Ahn would stay in the practice. Russo's theory about Dr. Ahn's stereotypical view of women in general does not demonstrate that the Institute's reason for terminating her employment was pretextual, or that Dr. Ahn could be found to harbor such views (on the evidence presented) and manipulated the practice into firing Russo because of his discriminatory views.

Because Russo has not pointed to record evidence giving rise to a factual dispute that requires trial on the

discrimination claim, the Institute is entitled to summary judgment on Count I.

   B.   Retaliation – Count II

Russo argues briefly that the Institute retaliated against her after receiving her attorney's demand letter on April 29, 2019.  The undisputed evidence shows that the following events occurred after the partners voted to terminate Russo's employment at the Institute.  Talbot-Kleeman notified Russo of the partner's vote to terminate her employment the day after the vote, on March 26, 2019.  On March 29, Talbot-Kleeman spoke with Russo about a post-termination transition and severance plan. During that conversation, Russo said she believed that the vote to terminate her employment was due to a pattern of gender bias against women at the Institute, in which male doctors regularly mistreated women.[16]  Russo continued to work after the termination vote and after her conversation with Talbot-Kleeman.

The Institute and Russo began a process of negotiating the terms of her transition and a severance package.  In addition to

---

[16] Although Russo disputed this particular statement from the Institute's statement of facts, her only ground was that the statement was unsupported by the record.  That statement, however, was quoted from Russo's complaint.  See, e.g., Fed. R. Civ. P. 11.  She does not dispute the next statement based on Talbot-Kleeman's deposition testimony that Russo raised gender bias during that conversation.

the transition period, Russo hoped to be able to continue working as an independent contractor with one of the Institute physicians at the Hillsborough County Nursing Home.  Russo and Talbot-Kleeman exchanged potential transition plans, but Russo never agreed to a plan.

On April 29, 2019, about a month after the partners voted to terminate her employment, Russo's attorney sent a letter to Talbot-Kleeman following up on previous discussions about the terms of Russo's proposed transition and a proposed independent contractor agreement.  Doc. no. 83-11.  In that letter, Russo's attorney made observations about the decision to terminate Russo, about perceived gender issues in the practice, and about Russo's best interests.  She stated that she could not advise Russo to accept the Institute's independent contractor agreement (which she apparently expected would include the proposed transition and severance plans).  With respect to the lower severance pay amount offered by the Institute for a shorter transition period, Russo's attorney wrote:  "it is absurd that the Institute now seeks to penalize Ms. Russo for not wanting to continue working in this hostile and discriminatory environment, for three additional months."  Id. at 2.  The attorney further stated:

> Ms. Russo also remains willing to reach an amicable
> and private resolution to the employment matter. She
> has authorized me to convey that she is willing to

> release her claims against the Institute and its
> partners for the amount of $100,000.00 (one hundred
> thousand dollars), which represents less than one year
> of compensation. Given the duration of her employment
> the facts surrounding her termination; and the
> Institute's long-standing knowledge of and refusal to
> address the issues with the partner demanding her
> termination, we feel this is an appropriate figure.

Id. The Institute's attorney responded to Russo's attorney's

demand letter on May 3, 2019, ending the transition period and

making Russo's employment termination effective as of May 2,

2019.

Talbot-Kleeman interpreted Russo's demand letter as a

threat of litigation for wrongful termination.  The Institute's

attorney notified Russo's attorney that all requests for

references from physicians in the practice for Russo would have

to go through the Institute's attorneys.  Talbot-Kleeman

notified physicians in the practice of that policy.  Russo's

attorney did not respond to the communication from the

Institute's attorney about physician references, and Talbot-

Kleeman told Drs. Luther and Jenkins that their references for

Russo could not be sent until Russo's attorney sent an

"acknowledgment" of that communication.  Doc. no. 88-8.

Eventually, Russo did obtain references from physicians in the

practice, and she was hired and began a new job in July 2019.

It is a violation of Title VII, 42 U.S.C. § 2000e-3(a), for

an employer to retaliate against an employee "who has complained

about discriminatory employment practices." Kinzer v. Whole Foods Mkt., Inc., 99 F.4th 105, 115 (1st Cir. 2024). Courts use the McDonnell Douglas framework to evaluate a Title VII retaliation claim. Serrano-Colon v. United States Dep't of Homeland Sec., 121 F.4th 259, 272 (1st Cir. 2024). "To establish a prima facie case of retaliation, [the plaintiff] must prove: (1) she engaged in protected conduct; (2) she was subjected to an adverse employment action; and (3) the adverse employment action is causally linked to the protected conduct." Id. at 272-73 (internal quotation marks omitted). "'An employee has engaged in activity protected by Title VII if she has either (1) opposed any practice made an unlawful employment practice by Title VII[17] or (2) made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or

---

[17] Title VII, 42 U.S.C. § 2000e-2, provides as follows:
It shall be an unlawful employment practice for an employer--
**(1)** to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
**(2)** to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

hearing under Title VII.'"  Id. at 273 (quoting Fantini v. Salem
State College, 557 F.3d 22, 32 (1st Cir. 2009)).

Russo contends that her attorney's April 29 demand letter
qualified as protected conduct and that the Institute retaliated
against her with an adverse employment action by terminating her
employment as of May 2, without a further transition period or
the possibility of an independent contractor relationship to
work at the Hillsborough County Nursing Home.  She also contends
that the Institute retaliated against her by preventing
individual physicians in the practice from providing references
to support her applications for employment.  The Institute
responds that Russo's employment under the transition period
ended on May 2 because her attorney's April 29 letter rejected
the Institute's proposals and that the processing restriction on
references was consistent with the Institute's policies and
intended to prevent inconsistency between the Institute's
statements and Russo's statements on her employment
applications.

As presented, Russo's attorney's April 29 demand letter
notified the Institute of her claims of gender discrimination.
Although she had previously raised the issue of gender
discrimination in passing during a conversation with Talbot-
Kleeman, the letter explicitly made a claim of gender
discrimination, suggested litigation, and made a demand for

compensation.  In that context, the demand letter qualified as protected conduct - a complaint of gender discrimination.

The disputed issue is whether the Institute imposed an adverse employment action on Russo in retaliation for her claims of gender discrimination.  "The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm."  Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67 (2006); accord Rodríguez-Severino v. UTC Aerospace Sys., 52 F.4th 448, 464 (1st Cir. 2022).  That is, to be actionable, the retaliation must be such "that a reasonable employee would have found the challenged action materially adverse . . . [meaning] it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Id. at 68.  Context is important when assessing the materiality of the adversity to the employee.  Id.

Russo contends that the Institute retaliated against her by preventing the surgeons in the practice from giving her employment references.  The evidence shows, however, that Talbot-Kleeman directed physicians to pass their references through the Institute's attorney.[18]  The process that Talbot-

---

[18] Whether or not the process directed by Talbot-Kleeman was consistent with an Institute policy or handbook seems beside the point.  For that reason, the court will not pursue the issues of whether such a policy applied in these circumstances and whether it had been applied uniformly in the past.

Kleeman imposed may have caused some minor delay in Russo obtaining references, but she provides no evidence that the process caused her any harm or injury.[19]

The undisputed evidence shows that individual physicians provided references for Russo.  The evidence also shows that she accepted a new job about two months after she stopped working at the Institute.  Taken in context, Russo has not shown that the reference process constituted a materially adverse employment action sufficient to support a retaliation claim.

To the extent Russo may also claim that the Institute imposed a materially adverse action by ending her transition employment in retaliation for the demand letter, a theory which is not developed in Russo's objection, the evidence does not show any materially adverse action.  Russo does not argue or present evidence to show that the Institute caused her any loss of income or opportunity because of the May 2 end date.  In fact, the undisputed evidence shows that she ended the transition period and that the Institute imposed no materially adverse action.

---

[19] An employer's decision to withhold entirely a letter of recommendation may be an adverse employment action for purposes of a retaliation claims.  See Noonan v. Consol. Shoe Co., Inc., 84 F.4th 566, 576 n.8 (4th Cir. 2023).

At the time of the demand letter, Russo's employment had already been unequivocally terminated by the partners' vote. She was working in a transition period while a plan for her departure and possible severance pay, along with a potential independent contractor agreement, were being negotiated.  In her April 29 letter, Russo's attorney plainly rejected the Institute's proposals for the transition period and did not offer a counter proposal for transition and severance or for an independent contractor position at the Hillsborough County Nursing Home.  As such, Russo's attorney effectively ended the transition negotiations, leaving only a date for Russo's departure, which the Institute's attorney set as May 2.

In short, then, Russo's employment was terminated by the partners' vote on March 25.  The transition period ended on May 2 in response to Russo's decision expressed in the April 29 letter not to accept the Institute's transition and severance proposals.  Russo does not describe any factual dispute as to whether the Institute caused her harm or injury by ending the transition period when she effectively rejected the transition and severance proposals.

Because Russo has not shown a factual dispute as to whether the reference process or the end date of the transition period were materially adverse employment actions, the Institute is entitled to summary judgment on the retaliation claim.

31

C.  <u>Wrongful Discharge – Count IV</u>

Russo brings a wrongful termination claim under New Hampshire common law, alleging that she was terminated for "properly advising patients of the risks of medical procedures and reporting Ahn's activities that deviate from best practices in medicine, which are protected by public policy."  Doc. no. 1, at 23.  The Institute moves for summary judgment on that claim on the ground that she lacks evidence to prove its elements.  In response to the motion for summary judgment, Russo states that her wrongful discharge claim also includes her assertion that she was terminated for the protected activity of reporting that Dr. Ahn's patient care was substandard and that his behavior posed a threat to public safety.

"A wrongful termination claim under New Hampshire law contains two elements: '(1) the employer terminated the [plaintiff's] employment out of bad faith, malice, or retaliation; and (2) the employer terminated the employment because the employee performed acts that public policy would encourage or because she refused to perform acts that public policy would condemn.'"  <u>Vera v. F.W. Webb Co.</u>, No. 23-CV-0198-SE, 2025 WL 603808, at *8 (D.N.H. Feb. 25, 2025) (quoting <u>Donovan v. S. New Hampshire Univ.</u>, 175 N.H. 489, 492 (2022)).  "Under New Hampshire law, an 'employer's bad faith or malice may be established where (i) an employee is discharged for pursuing

32

policies condoned by the employer, (ii) the record does not support the stated reason for the discharge, or (iii) disparate treatment was administered to a similarly situated employee.'" Yvars v. AstraZeneca Pharms. LP, No. 24-CV-237-SE, 2025 WL 607962, at *2 (D.N.H. Feb. 19, 2025) (quoting Hidalgo-Semlek v. Hansa Med., Inc., 498 F. Supp. 3d 236, 268 (D.N.H. 2020)). "Bad faith can also be discerned from the course of events surrounding an employee's discharge, the manner in which the plaintiff was discharged, or shifting reasons for an employee's termination." Id. (internal quotation marks omitted).

Russo proffers no evidence that the Institute acted in bad faith or with malice when the partners voted to terminate her employment. Again, the undisputed evidence establishes that the partners voted to terminate Russo's employment to retain Dr. Ahn in the practice, even though some of the partners disagreed with Dr. Ahn's assessment of Russo and his reasons for seeking her termination. Despite that vote, the Institute retained Russo's services while attempting to come to a mutually acceptable agreement about a transition period and a severance package. In the absence of evidence of bad faith or malice, the court need not consider the public policy element of the claim.

The Institute is entitled to summary judgment on Russo's wrongful discharge claim.

## Conclusion

For these reasons, the Institute's motion for summary judgment (doc. no. 82) is granted.

The other pending motions (doc. nos. 62, 69, 70, 71, and 76) are terminated as moot.

The clerk of court shall enter judgment in accordance with this order and the previous summary judgment order (doc. no. 64) and close the case.

SO ORDERED.

Steven J. McAuliffe
United States District Judge

April 24, 2025

cc:  Counsel of Record